IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AJZN, INC. f/k/a AERIELLE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-149-GMS |
| | ) | |
| DONALD YU, et al. | ) | **REDACTED** |
| | ) | **PUBLIC VERSION** |
| Defendants. | ) | |

## SECOND DECLARATION OF BENJAMIN G. STEWART

I, BENJAMIN G. STEWART, declare:

1.    I am a Partner at the law firm of Keating Muething & Klekamp, PLL, counsel for Defendants, and am duly admitted to practice law in the state of Ohio, and am admitted *Pro Hac Vice* in the District of Delaware in the above-captioned action.

2.    I have personal knowledge of the matters set forth in this declaration, and, if called to testify, could and would competently testify about them.  I submit this application in support of Defendants' Reply in Support of Summary Judgment and Defendants' Response to Plaintiff AJZN, Inc.'s Evidentiary Objections.

3.    Attached hereto as **Exhibit A** is a true and accurate copy of pertinent portions of the deposition of Arthur Cohen.

4.    Attached hereto as **Exhibit B** is a true and accurate copy of pertinent portions of the deposition of Deborah J. Ford.

5.    Attached hereto as **Exhibit C** is a true is a true and accurate copy of Highly Confidential portions of the deposition of Deborah J. Ford.

6.    Attached hereto as **<u>Exhibit D</u>** is a true and accurate copy of the verification page to Defendant Aerielle IP Holdings, LLC's Answer to Plaintiff AJZN, Inc. F/K/A/ Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things.

7.    Attached hereto as **<u>Exhibit E</u>** is a true and accurate copy of the verification page to Defendant Aerielle Acquisition Corporation's Answers to Plaintiff AJZN, Inc. F/K/A Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct, and that I executed this declaration on February 11, 2016 in Cincinnati, Ohio.

_____
Benjamin G. Stewart (0082638)

6594902

# EXHIBIT A

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          IN AND FOR THE DISTRICT OF DELAWARE

 3

 4   AJZN, INC., f/k/a AERIELLE,    )

     INC.,                         )

 5                                 )

                  Plaintiff,       )

 6                                 )

             vs.                   )   No. 13-149-GMS

 7                                 )

     DONALD YU; AERIELLE, LLC;     )

 8   GREAT AMERICAN LIFE INSURANCE )

     COMPANY; AERIELLE             )

 9   TECHNOLOGIES, INC.; AERIELLE  )

     ACQUISITIONS CORPORATION,     )

10   AERIELLE IP HOLDINGS, LLC;    )

     and DOES 1 through 10,        )

11   inclusive,                    )

                                   )

12                  Defendants.    )

     _____)

13

14

15

16          Oral Deposition of ARTHUR COHEN,

17      pages 1 through 271, taken on behalf

18      of Defendants, at 1900 Camden Avenue,

19      Suite 101, San Jose, California,

20      beginning at 9:15 a.m. and ending at

21      5:35 p.m. on Thursday, September 10,

22      2015, before Noelia Espinola,

23      California Certified Shorthand

24      Reporter No. 8060.

25
```

1    lunch.  It's going to go faster.

2         A    Okay.  Are we finished with this document?

3         Q    Yes, for now.  Sorry.  Thank you.

4         A    Okay.

5         MR. STEWART:  Can you mark this as Exhibit 5,

6    please.

7              (Defendants' Exhibit 5 was marked

8              for identification and is attached

9              hereto.)

10             (Discussion off the record.)

11   BY MR. STEWART:

12        Q    Mr. Cohen, I've handed you what has been

13   marked as Exhibit 5.

14             For the record, it's a document entitled

15   "Security Agreement," and it has the production

16   numbers 01298 through 1315.

17             Can you turn to page 1311?

18        A    Yes.

19        Q    Does your signature appear twice on the page

20   with the production number GA 1311?

21        A    Yes, that appears to be my signature.

22        Q    Did you, in fact, sign this document on

23   behalf of Aerielle, Inc., and Aerielle Technologies,

24   Inc.?

25        A    That's what the document says.  My

1   signatures are on those, yes.

2        MR. STEWART:  Can we mark this as Exhibit 6.

3            (Defendants' Exhibit 6 was marked

4        for identification and is attached

5        hereto.)

6   BY MR. STEWART:

7        Q   Mr. Cohen, I've handed you what has been

8   marked as Exhibit 6.  Can you turn to page GA 1326?

9            For the record, this is a document with the

10  production numbers GA 1316 through GA 1329.  It's

11  titled "Stock Pledge Agreement."

12           Mr. Cohen, does your signature, in fact,

13  appear on GA 1326?

14       A   That appears to be my signature on this

15  stock pledge document, which appears to be that.

16       Q   Did you, in fact, sign this document on

17  behalf of Aerielle, Inc.?

18       A   It appears that I signed this document, yes.

19       Q   A --

20           As we're seeing, the parties executed a

21  series of documents on or around September 17, 2007,

22  correct?

23       A   Correct.

24       Q   You mentioned earlier that you were --

25           And in this case "you" I mean plaintiff.

1            -- advised by Fenwick & West during the

2    course of this transaction; is that correct?

3        A    They were our attorneys.

4        Q    And would they have reviewed all the

5    documents that you signed before you signed them?

6        A    Correct.  I'd like to add to that, however.

7        Q    Go ahead.

8        A    I mean, you know, I can't -- I can't recall

9    that they -- this date in time, I don't know

10   100 percent what they reviewed and what they didn't

11   review.  But they were our attorneys, and that -- and

12   they were supposed to have reviewed all of these

13   documents.  That's what I can say today, you know,

14   talking about something that was six or seven years

15   ago.  I just want to be clear about that.

16       Q    And to the extent you had a question or

17   didn't understand something in any of the documents

18   that were signed in connection with that transaction,

19   you could have asked Fenwick & West about it,

20   correct?

21       A    At that time I could have asked them.

22       MR. STEWART:   I'd like to mark this as

23   Exhibit 7

24           (Defendants' Exhibit 7 was marked

25       for identification and is attached

1    12,000 units in Aerielle, LLC.  Is that correct?

2        A    That's what it says.

3        Q    Below that it says that Donald Yu will

4    receive a certificate for 20,000 warrants in

5    Aerielle, LLC, doesn't it?

6        A    That's what it says.

7        Q    So isn't it the case that if warrants in

8    Aerielle, LLC, turned out to be worthless, Donald Yu

9    had more to lose than Aerielle, Inc., had to lose?

10       A    You're asking me to make some kind of

11   calculations on motive.  And I don't know -- I don't

12   know all of Donald Yu's motives and/or why he did

13   what he did.

14       Q    So you can't speculate, sitting here today,

15   what Donald Yu was thinking when he agreed to -- when

16   he agreed to take a warrant for 20,000 shares in

17   Aerielle, LLC?

18       A    What I -- what I don't have to speculate on

19   is based off of discovery through a deposition of

20   Reba Gong, which showed that he, through direction of

21   GALIC, tried to make the warrant that Aerielle, Inc.,

22   had worthless.  And he asked Reba Gong to do things

23   to the books to make the warrant worthless.  At least

24   that's what she, under oath, in a deposition, stated.

25       Q    What --

1      A    Why Donald Yu decided to do that -- she said

2    that Donald Yu was -- told her that that's what GALIC

3    told him to do.

4         And there are many other -- you know, there

5    are many other activities that happened that

6    demonstrate that Tom Keitel and Joe Stelzer -- you

7    know, they're telling me that the warrant was

8    worthless in 200- -- was it October of 2010?

9         Meanwhile, based on documents that I just

10   read two days ago, in fact, internal documents, show

11   that they felt the company was worth as much as

12   $60 million.  Yet they sat down with my wife and I in

13   a restaurant -- Joe Stelzer, Tom Keitel -- and said

14   to us, The warrant's worthless.  Take this earnout

15   agreement instead.  That was their story.

16      Q    Well, let's unpack that litany of

17   allegations.

18         First of all, you're referring to the

19   testimony of Reba Gong.

20      A    Deposition.

21      Q    Deposition testimony of Reba Gong.

22         And you mentioned that she said that Donald

23   Yu told her to take steps to make the warrant

24   worthless, correct?  That was your understanding of

25   Reba Gong's testimony, correct?

1      A    That's correct.

2      Q    And I believe, if I recall her testimony,

3   both from being there and from reviewing her

4   transcript, she mentioned that she had prepared a

5   spreadsheet that would make the -- she was asked to

6   prepare a spreadsheet that would wipe out the

7   interest of the warrant holders.  Is that consistent

8   with your understanding of what her testimony was?

9      A    I don't recall.

10     Q    You just recall that she said something

11  about making the warrant worthless?

12     A    That's correct, yes.

13     Q    What did she do --

14          Or what did Donald do to make the warrant

15  worthless?

16     A    She just told me that that was his intent

17  and told -- you know.  You know, it was a discussion

18  that they had.

19     Q    But can you tell me your understanding of

20  what she actually did or what he actually did to make

21  the warrant worthless?

22     A    She didn't do anything is the point.  She

23  didn't do anything to make the warrant worthless.

24  But she was given instructions about the intent to do

25  it.

1          Q    So she was given instructions to make the

2    warrant worthless, which it's your recollection she

3    didn't follow?  Am I understanding that --

4          A    That's correct.  And, according to her, they

5    fired her for it.

6          Q    And what was she told to do that would make

7    the warrant worthless?

8          A    I don't know.

9          Q    I recall her testimony being that she was

10   asked to prepare a spreadsheet that would make the

11   warrant worthless.

12         A    Again, I don't know.  You're asking me a

13   question, so --

14         Q    Do you have an understanding, sitting here

15   today, as to how a spreadsheet prepared by Reba Gong

16   could have made the warrant worthless?

17         A    I don't know.  All I'm expressing to you is

18   that Donald Yu expressed his intent to do that.  I

19   cannot get -- you know, you can ask Donald Yu what

20   his intent was when he spoke to Reba Gong to do that.

21         Q    Your contention in the complaint was that

22   the warrant was illusory and worthless when it was

23   issued, correct?

24         A    Can we go back to the complaint, exactly how

25   it's worded?

1     Q    Sure.   It's Exhibit 2.   I'm looking at

2    paragraph 18.

3     A    Oh, sorry.

4     Q    And I'm looking, just for example, in the

5    second sentence of paragraph 18.   You referred to

6    "the illusory Warrant."

7     A    Yes.

8          Do you have a question?

9     Q    I mean, is it -- I'm just making sure I

10    understand the contention.

11          Is it your contention that when the warrant

12    was issued, the defendants who existed at the time

13    knew that the warrant was worthless?   Is that --

14     A    That is a contention.   By their subsequent

15    actions, they prevented me from -- they also

16    prevented me from exercising the warrant.   I

17    attempted to exercise the warrant.   I was in a board

18    meeting.   And I asked the attorney of Aerielle, LLC,

19    I'm a board observer.   I would like to exercise the

20    warrant.

21          And he said great, send me an E-mail, and

22    I'll get you the warrant -- because I did not have

23    the original warrant -- and he said, I'll take care

24    of it.

25          I didn't hear from him for a little while,

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

AJZN, INC. f/k/a AERIELLE, INC.,   )
                                   )
              Plaintiff,           )
                                   )
        vs.                        )   Case No.
                                   )   13-cv-00149-MPT
DONALD YU; AERIELLE, LLC; GREAT    )
AMERICAN LIFE INSURANCE COMPANY;   )
AERIELLE TECHNOLOGIES, INC.;       )
AERIELLE ACQUISITIONS CORPORATION;)
AERIELLE IP HOLDINGS, LLC; and     )
DOES 1 through 10, inclusive,      )
                                   )
              Defendants.          )
_____)


DEPOSITION OF DEBORAH J. FORD, CPA

Costa Mesa, California

Friday, December 11, 2015


Reported by:

TRISHA WIENER

CA CSR No. 13576

JOB No. 305614

1        Q    And what is your new address?

2        A    2415 Campus Drive, Suite 225.  It's in

3    Irvine, California.  I think it's 92612.  It's on my

4    business card, if you'd like a copy.

10:08 5        Q    Thank you.

6             So as of October 15, 2015, the date of this

7    report, the CV was accurate?

8        A    Yes.

9        Q    And outside of that change in the address,

10:08 10   is there anything else on this CV that's changed

11   since the date of this report, October 15, 2015?

12       A    No.

13       Q    This report identifies you on the bottom,

14   second-to-last section, as a certified public

10:09 15   accountant; is that correct?

16       A    That's correct.

17       Q    And is that often referred to as a CPA?

18       A    Yes.

19       Q    Can you explain for the record and for the

10:09 20   Court what a CPA is?

21       A    It stands for certified public accountant.

22   It's a designated license from the State of

23   California.  In order to obtain it, you have to meet

24   certain educational requirements, take four --

10:09 25   I believe they're four-hour tests but the rules may

1    have changed since I took it, and meet some

2    experience requirements.

3              Q    And in California -- strike that.

4              Go ahead.

10:09  5         A    We also have to do continuing education to

6    maintain our license.

7              Q    That was going to be my question.

8              A    It's 80 hours for every two years.   It

9    requires an ethics component and it has to be -- and

10:09 10   a certain component has to be technical skills.

11             Q    And the CV indicates you've been a CPA since

12   2000; is that correct?

13             A    That's correct.

14             Q    There's no gap since 2000?

10:10 15        A    Nope.

16             Q    What is your current position at Hagen,

17   Streiff, Newton & Oshiro, Accountants, PC?

18             A    I'm a manager.

19             Q    Was that your position when you prepared

10:10 20   this report?

21             A    Yes.

22             Q    It says in your CV that your primary focus

23   is working with attorneys and others in providing

24   litigation support services and forensic accounting.

10:10 25             Can you explain to me what you mean by that?

1       A    So most of my job is measuring damages in

2    litigation scenarios, whether that is damages

3    sustained to a business or a person, like a lost

4    wages calculation, but we measure the damages related

10:10  5    to litigation.

6       Q    And did you do that in this case?

7       A    Yes -- no, I did not.  I didn't measure

8    damages.

9       Q    How much of your work is devoted to

10:11 10    litigation?

11       A    About half.

12       Q    What's the other half devoted to?

13       A    Insurance.

14       Q    And can you just briefly explain what you do

10:11 15    in the insurance field?

16       A    We're hired by insurance companies to

17    measure damages that's covered by insurance policies.

18    Sometimes they're very big losses, sometimes they're

19    small losses.  It covers all sorts of different types

10:11 20    of businesses.

21       Q    Do you often provide expert testimony?

22       A    Define "often."

23       Q    Okay.  The CV lists three cases where you

24    gave expert testimony.  What time period does that

10:11 25    cover -- strike that.

13

1          Are those the only three cases you've ever

2    given expert testimony in?

3          A    Yes.

4          Q    So I noticed sometimes, I think there's a

10:11  5    rule that says experts must disclose the last

6    four years -- I may be misquoting it -- of expert

7    testimony.

8          Just to be clear, in this case you're

9    disclosing all the expert testimony you've ever done;

10:12 10    is that correct?

11          A    Yes.

12          Q    This lists three matters where you've given

13    expert testimony, correct?

14          A    Yes.

10:12 15          Q    And these matters were in 2014, 2015,

16    correct?

17          A    Yes.

18          Q    Can you estimate what percentage of your

19    work in 2014, 2015 these matters represented?

10:12 20          A    A small percentage.  I have issued other

21    reports that I'm the expert in, but I haven't given

22    depositions or trials on them.

23          Q    Has your opinion ever been fully or

24    partially excluded by a court or arbitration panel?

10:12 25          A    No.

1      Q   Has your opinion or testimony ever been the

2   subject to a motion to exclude it from a trial or

3   arbitration proceeding?

4      A   Not that I know of.

10:13  5      Q   So as far as you know, your testimony has

6   never been the subject of what we call a Daubert

7   motion?

8      A   Never.

9      Q   Are you aware of any requests by a party in

10:13 10   litigation or arbitration to limit the scope or

11   breadth of any potential testimony that you would

12   give?

13      A   Not that I'm aware of.

14      Q   We talked a little bit about this, but it

10:13 15   says here that you conduct fraud examinations; is

16   that correct?

17      A   Yes.  I haven't done any recently, but I do

18   find fraud fascinating.

19      Q   As do we all.

10:13 20          What types of fraud do you examine?

21      A   So usually it's been employee theft and

22   fraud, whether it's a controller that's been accused

23   of embezzling money or an employee that's been

24   accessing funds that they shouldn't have access to.

10:14 25      Q   And when you do what you call "fraud

15

1    examination," are you typically attempting to

2    determine whether or not fraud occurred?

3         A    The definition of "fraud" gets a little

4    sticky, but we investigate and measure -- so we break

10:14  5    down what happened and where the money went and the

6    dollar amounts associated with it.

7         Q    And were you asked to do that in this case?

8         A    No.

9         Q    You mentioned this and it's also mentioned

10:14 10   on your CV.  You do work tracing employee theft?

11        A    Yes.

12        Q    Would you consider that related to your work

13   in fraud examinations?

14        A    Yes.

10:14 15        Q    I saw that you've given presentations on

16   employee theft; is that right?

17        A    I did.

18        Q    Is this a major part of your practice?

19        A    No, I just find it fascinating.

10:14 20        Q    When you analyze employee theft, does that

21   sometimes involve employees submitting improper,

22   excessive expense reports?

23        A    Yes.

24        Q    And as an expert in employee theft, do you

10:15 25   sometimes quantify damages associated with employees

1    submitting excessive expense reports?

2         A    Yes.

3         Q    Did you do that in this case?

4         A    I did not.

10:15  5    Q    Were you asked to do that in this case?

6         A    No.

7         Q    Have you ever analyzed damages stemming from

8    an alleged breach of fiduciary duty?

9         A    Probably.

10:15 10    Q    Does that mean that sitting here today, you

11   can't recall any specific times where you were asked

12   to analyze damages stemming from an alleged breach of

13   fiduciary duty?

14        A    When I'm hired, I measure the damages.  The

10:15 15   sort of what caused it or the reasons behind it,

16   I don't always recall.  I focus on the measurement of

17   damages, what happened, not the terminology behind

18   it.  So I've measured damages.

19        Q    So you think you've measured damages

10:15 20   stemming from an alleged breach of fiduciary duty?

21        A    I can't recall one right now.

22        Q    Do you think you would be qualified to

23   measure damages from an alleged breach of fiduciary

24   duty?

10:16 25        A    Depending what the damages were, yes.

1       Q    Were you asked to analyze any damages

2   stemming from an alleged breach of fiduciary duty in

3   this case?

4       A    No.

10:16  5    Q    I believe you testified you weren't asked to

6   measure any damages in this case, correct?

7       A    Correct.

8       Q    There's a reference on here to something

9   called "contingent business interruption."

10:16 10        Do you see that?

11      A    Yes.

12      Q    What is that?

13      A    It's a specific type of insurance claim

14  where maybe my facility wasn't damaged, but my

10:16 15  supplier's facility was damaged so that I wasn't able

16  to continue my sales, continue my operations because

17  of someone else's issues.  So my loss is contingent

18  on someone else's loss.

19      Q    Have you ever been asked to analyze a case

10:16 20  involving tortious interference with contract?

21      A    No.

22      Q    Excluding this case.

23        I'm going to ask you about valuing

24  intellectual property, but I just want to be clear

10:17 25  for the record that I'm going to ask about your

1    experience before this case, but I want to be clear

2    for the record that by asking you about your

3    experience about valuing intellectual property before

4    this case, I'm not conceding that you actually did

10:17 5    value intellectual property in this case, just to be

6    clear for the record.

7         So having said that, putting aside the

8    current case and subject to that disclaimer, have you

9    ever been asked to opine on the value of intellectual

10:17 10    property?

11    A    In the case of United Housing Services, UHS,

12    there was intellectual property involved, but it was

13    customer lists.  So one party was alleging that the

14    other party stole their customer lists, and

10:17 15    I measured the damages associated with those

16    particular customers.  So I took how much those

17    customers were worth in revenue, the costs associated

18    with fulfilling that revenue service.  So I measured

19    how much income those customers were worth to the

10:18 20    party, but that was -- that's considered intellectual

21    property.

22    Q    And again, just to be clear for the record,

23    you're referring to the case listed on your CV,

24    United Housing Service versus Aklero Risk Analytics,

10:18 25    et al.?

19

1        A    Yes.

2        Q    Are there any other cases, putting aside

3    that case and putting aside the current case and

4    subject to my disclaimer from before, where you've

10:18  5    been asked to measure the value of intellectual

6    property?

7        A    No.

8        Q    So focusing on the United Housing Service

9    case, the intellectual property that was at issue in

10:18 10    that case were customer lists; is that correct?

11        A    Correct.

12        Q    Were there any patents at issue in that

13    case?

14        A    No.

10:18 15        Q    Have you ever been asked to opine on the

16    value of patents, excluding this litigation?

17        A    No.

18        Q    So prior to October 15th, how many patent

19    valuations had you performed?

10:19 20        A    Zero.

21        Q    Prior to October 2015, had you ever been

22    asked to review or analyze a valuation of

23    intellectual property that was prepared by another

24    person?

10:19 25        A    No.

1      Q    Have you ever been asked to review a patent

2  valuation prior to this case?

3      A    No.

4      Q    Have you ever offered an opinion as to the

10:19  5  adequacy of a patent valuation performed by another

6  party?

7      A    No.

8      Q    Have you ever testified concerning the value

9  of intellectual property?

10:19 10      A    Excluding the one we've already discussed?

11      Q    No, including that.

12           You did testify in that case?

13      A    I did testify in that case.

14      Q    And again, just so the record's clear, you

10:19 15  did testify about the value of the customer lists in

16  the United Housing Service case, correct?

17      A    Yes.

18      Q    Excluding that case, excluding today,

19  subject to my disclaimer, have you ever been asked to

10:19 20  testify concerning the value of intellectual

21  property?

22      A    No.

23      Q    Have you ever been asked to testify

24  concerning the value of patents?

10:20 25      A    No.

1          Q    Have you written any papers concerning

2     methods used to value intellectual property?

3          A    No.

4          Q    Have you written any papers concerning

10:20 5   methods used to value patents?

6          A    No.

7          Q    Have you received any training on how to

8     value patents?

9          A    No.

10:20 10        Q    Have you received any training on how to

11    value intellectual property?

12         A    Yes.

13         Q    What training have you received?

14         A    The AICPA has a credential called the ABV,

10:20 15  and I'm in the process of getting that license.

16    That's a business valuation license, but part of that

17    is intellectual property.  So I have received some

18    training in the valuation of intellectual property.

19         Q    But that training did not include training

10:20 20  on valuing patents; is that correct?

21         A    Correct.

22         Q    And just so I'm clear for the record, what

23    is the AICPA?

24         A    American Institute of Certified Public

10:20 25  Accountants.

22

1      Q    You're trying to get an ABV accreditation?

2      A    I'm in the process of getting my ABV.

3      Q    What does ABV stand for?

4      A    Accredited in Business Valuation.

10:21 5      Q    But you don't have that credential yet,

6  correct?

7      A    Correct.

8      Q    So currently do you have any certifications

9  specifically related to valuing intellectual

10:21 10  property?

11      A    No.

12      Q    Do you have any certifications specifically

13  related to valuing patents?

14      A    No.

10:21 15      Q    Excluding your work on this case or your

16  preparation for your work on this case, have you read

17  any papers, books, or articles concerning how to

18  value patents?

19      A    No.

10:21 20      Q    Have you read any books, articles, papers

21  concerning different methods for valuing patents?

22      A    No.

23      Q    In preparation for this case, did you read

24  any books, articles, or papers concerning the

10:21 25  valuation of patents?

1       A    No.

2       Q    Prior to this deposition, did you review the

3   report prepared by Mike Pellegrino in this case?

4       A    What was the first part of the question?

10:22  5       Q    Prior to this deposition, did you review the

6   report prepared by Mike Pellegrino in this case?

7       A    Yes.

8       Q    And to be clear, you didn't review that

9   report obviously before preparing your report?

10:22 10       A    Yes.

11       Q    Did you read the discussion concerning IP

12   valuation in his report?

13       A    Yes.

14       Q    Did you read any of the books, articles, or

10:22 15   papers cited in his report?

16       A    No.

17       Q    And just to be clear for the record,

18   I'm referring to the published books and papers that

19   he referred to in his report.

10:22 20            You did not read any of those?

21       A    I didn't read those.  Regarding patents,

22   I didn't read those.

23       Q    So we talked about your work in United

24   Housing Service.  We talked about the certification

10:22 25   that you're getting.

1          Outside of those two things, is there any

2    other professional experience related to valuing

3    intellectual property that we haven't discussed

4    today?

10:22  5          A    I've assisted some of the partners in my

6    firm in valuing intellectual property.

7          Q    Have you assisted any of the partners in

8    your firm in valuing patents?

9          A    There was a medical patent, yes.

10:23 10         Q    Can you tell me the --

11         A    I think we were measuring the royalty rates.

12         Q    Can you tell me the name of the partner you

13    were working with on that case?

14         A    Chris Money.

10:23 15         Q    When was that?

16         A    This year, in 2015.

17         Q    What was your role in that engagement?

18         A    Analysis of the documents, calculation of

19    royalty rates.

10:23 20         Q    In connection --

21              Can you tell me the name of the --

22         A    I can't recall it right now.  I know it was

23    a hernia patent.  I think it started with an A.

24         MS. DONAHUE:  Amato, that case?

10:24 25         THE WITNESS:  Yeah, Amato.

BY MR. STEWART:

    Q   That's the name of the company?

    A   I'm not sure if it was the company or the individual, but we called it "Amato."

    Q   Was that your client?

    A   Not mine.

    Q   Was that your firm's client?

    A   I don't know if Amato was, again, the firm's name or the party's name.  I don't recall.

    MS. DONAHUE:  It was a party.  I can get you that information.

    MR. STEWART:  Thank you.

    Q   And am I to assume that this matter involved work with Ms. Donahue's law firm?

    A   It appears to be.  I don't recall.

    Q   How long did you spend on that matter?

    A   I don't recall.  40 hours?

    Q   Of those 40 hours, how much was devoted to valuing a patent?

    A   Again, we didn't value the patent.  We measured the royalty.

    Q   So in that case you weren't actually attempting to value a patent?

    A   No.

    Q   Are there any other cases or matters that

26

1    you've worked on that in any way involved analyzing

2    patents?

3         A    Patents, no.

4         Q    And I take it from your previous answer,

10:25 5    there are other matters that you've assisted on that

6    involved in some way analyzing intellectual property

7    other than patents, correct?

8         A    Correct.

9         Q    How many matters?

10:25 10        A    That's difficult to say because intellectual

11    property covers so many things.

12        Q    Is it fair to say many matters have in some

13    way touched on intellectual property other than

14    patents?

10:25 15        A    Yes.

16        Q    But sitting here today, the only matter that

17    you can recall that involved a patent was the matter

18    you worked on with Chris Money for about 40 hours

19    this year, correct?

10:25 20        A    Yes.

21        MR. STEWART:    Can we mark the notice as

22    Exhibit 2?

23        THE REPORTER:    Yes.

24            (Defendants' Exhibit 2 was marked

10:26 25        for identification and is attached

27

1          hereto.)

2     BY MR. STEWART:

3          Q    Ms. Ford, I've handed you what's been marked

4     as Exhibit 2.  It's a subpoena to testify in a civil

10:26  5     action.  It has an exhibit.

6               Have you seen this document before?

7          A    Yes.

8          Q    Are you here today pursuant to this

9     subpoena?

10:26 10          A    Yes.

11          Q    The subpoena asked you to bring documents

12     today; is that correct?

13          A    Yes.

14          Q    And did you bring the documents that were

10:26 15     requested by the subpoena today?

16          A    Yes.

17          Q    And your counsel was nice enough to hand me

18     a stack of documents before the deposition, and we'll

19     talk about those specific documents later, but it

10:27 20     appears to me that these are documents that you

21     reviewed in connection with this engagement?

22          A    Yes.

23          Q    In other words, these are documents

24     generated or maintained by some of the parties in

10:27 25     this litigation that you reviewed, correct?

1    compensation for work on this matter?

2        A    No.   I don't believe we even collected a

3    retainer.

4        Q    I want to talk about the scope of what you

10:40 5    were asked to do in this case.

6             Let's start on page 3 of your report.

7        A    Okay.

8        Q    Section B of page 3 of your report says,

9    "Assignment."   And it says, "I was retained by

10:40 10    O'Neil LLP, attorneys for AJZN, Inc., the Plaintiff,

11    to determine the amount of assets in excess of

12    liabilities that were purchased under the Asset

13    Purchase Agreement."

14             Did I read that correctly?

10:40 15        A    I believe so.

16        Q    Does that accurately reflect your

17    understanding of what you were assigned to do in this

18    case?

19        A    Yes.

10:41 20        Q    And we'll talk about the substance of your

21    opinion later, but you offer an opinion as to the

22    amount of assets less the assumed liabilities that

23    were purchased, correct?

24        A    Yes.

10:41 25        Q    And the asset purchase agreement we're

1   referring to here, just to be clear, is the asset

2   purchase agreement dated April 10, 2009, correct?

3        A    Correct.

4        Q    Did you, in fact, attempt to determine the

10:41 5   amount of assets that were transferred pursuant to

6   the asset purchase agreement?

7        A    Yes.

8        Q    And did that require you to opine on the

9   value of those assets?

10:41 10       A    No.

11       Q    Can you explain -- can you explain why you

12   would say no to that?

13       A    I took the assets as they were written on

14   the balance sheets as the values that were taken by

10:41 15   the parties and contemplated in that purchase

16   agreement.  I didn't independently value receivables.

17   I didn't independently value any of their assets,

18   like fixed assets or office equipment.  I didn't go

19   back and value inventories.  I took the book value as

10:41 20   recorded.

21       Q    Can you explain to me your understanding of

22   what "amount of assets" means in this context?

23       A    The "amount of assets"?

24       Q    Yes.

10:42 25       A    Is the assets that were --

1          The book value of -- no.

2          The assets that were on the books and

3     contemplated in the agreement.  I didn't go back and

4     value.  I just took the dollar amount associated with

10:42  5     them.  There's a slight difference in terminology.

6          Q    So in your view and your opinion, you did

7     not perform a valuation in this case?

8          A    Correct.

9          Q    So you were not attempting to determine the

10:42 10     value of the assets that were transferred pursuant to

11     the April 10, 2009 asset purchase agreement; is that

12     correct?

13          A    I did not value the fair market value.

14     I took the amount that the parties believed the

10:42 15     assets were worth at the time.  So it could be the

16     value to them, but I didn't perform a valuation.

17          Q    So your assignment in this case, as you

18     understood it, was to determine what the parties

19     believed the assets were worth as of April 10, 2009?

10:43 20          A    Based on the documents that I could find.

21     Obviously I can't read their minds, so I took the

22     documents and the information provided at that time,

23     what were they worth to them.

24          Q    And you were not asked to perform a damages

10:43 25     calculation; is that correct?

1        A    Correct.

2        Q    Are you familiar with methodologies that are

3    used to calculate damages?

4        A    Yes.

10:43 5        Q    Are you familiar with methodologies that

6    could be used to calculate damages in this case?

7        A    Depends on what he's alleging, but usually

8    in your damages calculation you calculate what would

9    have happened but for the alleged action and what

10:43 10    actually happened and measure the difference.

11        Q    And you were not asked to do that in this

12    case?

13        A    I was not asked to do that.

14        Q    Would you be qualified to calculate the

10:44 15    damages in this case if asked to do so?

16        A    Depending on the assumptions and the

17    circumstances, yes.

18        Q    And sitting here today, you don't know what

19    the assumptions and circumstances are?

10:44 20        A    Correct.

21        Q    I'll represent to you, you may already be

22    aware of this, there's several claims pending in this

23    lawsuit that have been brought by plaintiff.

24        Were you asked to opine on which of those

10:44 25    claims the number that you came up with in this

 1    report relate to?

 2        A    No.

 3        Q    Were you asked to tie the amount of assets

 4    that you referred to to any particular claim in this

10:44  5    case?

 6        A    No.

 7        Q    Sitting here today, do you have any opinion

 8    as to whether any party in this case should be

 9    compensated based on what you call the "amount of

10:44 10    assets" that were transferred pursuant to the

11    April 10, 2009 asset purchase agreement?

12        A    Wouldn't that be a legal conclusion?

13             I just measured them.  I don't have an

14    opinion as to who should pay what.

10:45 15        Q    Do you have any opinion at all as to whether

16    any party is entitled to damages in this case?

17        A    No.

18        Q    Did you bring to bear any specifically

19    identifiable damages methodology in preparing your

10:45 20    report or formulating your opinions in this case?

21        A    No.

22        Q    Are you familiar with a warrant to purchase

23    12,000 units of Aerielle, LLC dated April 10, 2009

24    that was issued to the plaintiff in this case?

10:45 25        A    I'm aware of one existing, yes.

1      Q    Were you asked to determine the value of

2  that warrant?

3      A    No.

4      Q    And will you offer any opinion in this case

10:45  5  as to the value of that warrant?

6      A    No.

7      Q    Are you aware of an asset purchase agreement

8  dated December 31, 2010 between Aerielle, LLC and

9  Aerielle Acquisitions Corp.?

10:46 10      A    No.

11      Q    Were you asked to determine the amount of

12  assets as of -- strike that.

13           Were you asked to determine the amount of

14  assets that were transferred on December 31, 2010?

10:46 15      A    No.

16      Q    Do you have any opinion in this case as to

17  the amount of assets that were purchased in a

18  December 31, 2010 transaction between Aerielle, LLC

19  and Aerielle Acquisitions Corp.?

10:46 20      A    No.

21      Q    Did you attempt to determine the amount of

22  assets in excess of liabilities that were purchased

23  under a December 31, 2010 asset purchase agreement

24  between Aerielle, LLC and Aerielle Acquisitions

10:46 25  Corp.?

44

1      A    No.

2      Q    Did you conduct any analysis at all related

3   to the December 31, 2010 asset purchase agreement

4   between Aerielle, LLC and Aerielle Acquisitions

10:46   5   Corp.?

6      A    No.

7      Q    Did you make any attempt to value any assets

8   in this case as of December 31, 2010?

9      A    No.

10:46  10      Q    And will you offer any opinion concerning

11   the value of any assets as of December 31, 2010?

12      A    No.

13      Q    Were you asked to determine the amount of

14   assets that were purchased pursuant to a sale by

10:47  15   public auction that occurred on August 2, 2011?

16      A    No.

17      Q    Are you familiar or aware of a secured party

18   sale that took place on August 2, 2011 in which

19   Great American Life Insurance Company purchased the

10:47  20   assets of Aerielle Acquisitions Corp. and Aerielle

21   Technologies, Inc.?

22      A    Yes.

23      Q    And have you reviewed any documents

24   reflecting or related to that transaction?

10:47  25      A    The only document I was provided was a

1 letter from Great American saying that they did that.

2 I don't know any more details on it.

3   Q Did you do any analysis concerning the

4 amount of assets that were purchased in that

10:48 5 transaction?

6   A No.

7   Q Did you attempt to determine the amount of

8 assets in excess of liabilities that were sold on

9 August 2, 2011?

10:48 10   A No.

11   Q Did you conduct any analysis as to the value

12 of the assets that were purchased by public sale on

13 August 2, 2011?

14   A No.

10:48 15   Q Were you asked to determine the value of any

16 assets as of August 2, 2011?

17   A No.

18   Q And will you, in fact, offer any opinion

19 concerning the value of any assets as of August 2,

10:48 20 2011?

21   A No.

22   Q Were you asked to analyze whether the public

23 asset sale that occurred on August 2, 2011 complied

24 with the terms of the Uniform Commercial Code or

10:48 25 other applicable law?

1          A    No.

2          Q    Are you prepared to offer any opinion on

3     that topic?

4          A    No.

10:48 5         Q    Did you conduct any analysis in this case at

6     all concerning the value of any assets as of any date

7     in 2010?

8          A    No.

9          Q    Did you conduct any analysis in this case at

10:48 10    all concerning the value of any assets as of any date

11    in 2011?

12         A    No.

13         Q    Were you asked to determine the current

14    value of any assets at issue in this case?

10:49 15        A    No.

16         Q    Do you intend to offer any opinions about

17    the current value of any assets at issue in this

18    case?

19         A    No.

10:49 20        Q    Were you ever asked to opine whether any

21    party in this case was solvent or insolvent at any

22    specific time?

23         A    No.

24         Q    Were you asked to analyze whether any party

10:49 25    in this case was ever on the brink of insolvency at

1    any time?

2         A    No.

3         Q    I think we touched on this earlier, but you

4    were not asked to analyze any issues relating to

10:49 5    employee theft in this case; is that correct?

6         A    Correct.

7         Q    Can you turn to page 5 of your report?

8         A    Yes.

9         Q    Page 5 and 6 here contain a section called

10:50 10    "Information Considered."

11              And this is a list of documents, correct?

12         A    Correct.

13         Q    Are these all of the documents that you

14    reviewed when you prepared this report?

10:50 15         A    Yes.

16         Q    You didn't review any other documents, just

17    to be clear for the record?

18         A    I was provided other documents that I didn't

19    deem relevant, so I didn't review them and didn't

10:50 20    rely on them.  For instance, the legal documents

21    requesting documents from one side to another,

22    I didn't review them.

23         Q    So you were provided documents that you

24    reviewed and then didn't deem relevant or that you

10:50 25    deemed irrelevant before you reviewed them?

1      A    They are supplemental requests for

2  documents, I forget the legal term for them, like

3  form interrogatories.  If there was no documents

4  attached, I didn't rely on them.  I didn't even look

10:50  5  at them.  I only looked for documents.

6      Q    Did you review any interrogatory responses

7  in this case?

8      A    No.

9      Q    So outside of the documents listed here, you

10:50 10  also reviewed, it sounds like requests for documents?

11      A    Uh-huh.

12      Q    Are there any other documents outside the

13  requests for documents and the documents listed here

14  that you reviewed before preparing your report in

10:51 15  this case?

16      A    I think there's one document that we had

17  from the accountant, but I didn't rely on it in my

18  report.

19      Q    You said one document you got from the

10:51 20  accountant?

21      A    Reba.

22      Q    Gong?

23      A    Gong.

24      Q    So just so I'm clear, in addition to the

10:51 25  documents listed here and in addition to the document

1    requests, you also receive a document from Reba Gong?

2        A    Yes, but I did not rely on it in my report

3    or didn't utilize it in my report.

4        Q    Did you receive that document before you

10:51 5    prepared the report?

6        A    Yeah.

7        Q    Did she send that document directly to you?

8        A    No.

9        Q    Who did you receive that document from?

10:51 10       A    The attorneys.

11       Q    Was this a document that was prepared

12   recently specifically for you, or was this an older

13   document that was prepared while Ms. Gong worked at

14   Aerielle?

10:52 15       A    No.   I believe I asked her a question about,

16   for instance, the inventories, if there was any

17   obsolete issues back in April of 2009.

18       Q    Okay.   Let's just back up for a second.   We

19   were talking about documents and now we're moving

10:52 20   into conversations that you had.

21            Let's focus on documents just for a second.

22   So you listed the documents here that you reviewed.

23   You also looked at some document requests.   You

24   reviewed a communication from Reba Gong.

10:52 25       A    Uh-huh.

1      Q    Is there anything else that you considered

2   or reviewed before you drafted or prepared your

3   report in this case?

4      A    Not that I can recall.

10:52  5      Q    So --

6           I thought you were checking your watch.

7      A    No.  I'm looking at my footnotes to make

8   sure I didn't miss something.

9      Q    Understood.

10:52 10           You mentioned that you had, I guess, talked

11   to Reba Gong while you were preparing this report?

12      A    Yes.

13      Q    How many conversations did you have with her

14   before preparing this report?

10:53 15      A    One.

16      Q    Approximately how long before the report was

17   served was that conversation?

18      A    It was fairly recent before the report.

19   I don't recall.

10:53 20      Q    How long was that conversation?

21      A    It was pretty short.

22      Q    Less than a half hour?

23      A    Certainly.

24      Q    Did you receive the document that you

10:53 25   referenced before or after that conversation?

1        A    After.

2        Q    So she sent that document to someone who

3   eventually sent it to counsel or she sent it to

4   counsel and counsel gave it to you; is that correct?

10:53  5        A    Correct.

6        Q    So you had one fairly short conversation

7   with Reba Gong before preparing this report.

8             Did you have conversations with anyone else

9   before you prepared this report concerning the

10:53 10   matters that you ultimately opined on?

11        A    Besides the attorneys?

12        Q    Besides the attorneys, for now.

13        A    Art was on the conversation with Reba.

14        Q    So when you talked with Ms. Gong, Art Cohen

10:54 15   was also on the --

16             Was this a telephone conversation?

17        A    Yes.

18        Q    So you had a fairly short call with

19   Reba Gong and Art Cohen before you prepared your

10:54 20   report in this case, correct?

21        A    Correct.

22        Q    And you think that conversation was less

23   than a half an hour?

24        A    Yes.

10:54 25        Q    And were Ms. Gong and Mr. Cohen on the phone

52

1          Q    And you mentioned that you reviewed this

2     document again in preparation for this deposition,

3     correct?

4          A    I looked up one particular fact, but

11:00  5  I didn't review the whole thing again, no.

6          Q    What was that particular fact?

7          A    It was the liabilities assumed from the --

8     not the liabilities assumed.

9               It was the proceeds from litigation.

11:00 10       MR. STEWART:  Can we mark this as Exhibit 4?

11             THE REPORTER:  Yes.

12               (Defendants' Exhibit 4 was marked

13               for identification and is attached

14               hereto.)

11:00 15  BY MR. STEWART:

16        Q    Item 2 under "Information Considered" says,

17    "First Amended Complaint," correct?

18        A    Correct.

19        Q    And is the document that I've handed you

11:00 20  which has been marked as Exhibit 4 the first amended

21    complaint referred to?

22        A    Yes.

23        Q    Did you read the entire complaint?

24        A    Yes.

11:00 25       Q    If you look, there's an exhibit attached to

1   that complaint -- strike that.

2          Is there an exhibit attached to that

3   complaint?

4          A    Exhibit A.

11:00  5   Q    And that is a warrant to purchase shares,

6   correct?

7          A    Yes.

8          Q    And did you review that document in

9   preparation for your work on this case?

11:01 10       A    Yes.

11         Q    Did you read any other pleadings in this

12  case other than this amended complaint?

13         A    No.

14         Q    I'll represent to you that in response to

11:01 15  this amended complaint, the defendants filed a motion

16  to dismiss pursuant to Rules 9(b) and 12(b)(6) of the

17  Federal Rules of Civil Procedure.

18         Did you review that motion?

19         A    No.

11:01 20       Q    Did you review the Court's order on that

21  motion?

22         A    No.

23         Q    Are you aware that certain claims set forth

24  in that complaint have been dismissed?

11:01 25       A    Yes.

1          Q    How did you become aware of that?

2          A    The -- our counsel told me.

3          Q    Was that relevant to your analysis at all?

4          A    No.

11:01  5    Q    Did you review the answer filed by

6    defendants denying most of the allegations set forth

7    in this complaint?

8          A    No.

9          Q    To be clear, you reviewed plaintiff's

11:02 10   allegations without reviewing defendants' responses

11   to those allegations before you rendered an opinion

12   in this matter; is that correct?

13         A    Correct.

14         MR. STEWART:  Can we mark this as Exhibit 5?

11:02 15   THE REPORTER:  Yes.

16              (Defendants' Exhibit 5 was marked

17         for identification and is attached

18         hereto.)

19   BY MR. STEWART:

11:02 20   Q    Number 3 under your "Items Considered" on

21   page 6 of your report refers to a "Patent Portfolio

22   Financial Model for Aerielle as of December 23, 2009

23   by ipCapital Group," correct?

24         A    Yes.

11:02 25   Q    And is the document I've just handed you

1    which has been marked as Exhibit 5 that financial

2    model?

3         A    Yes.

4         Q    And you reviewed this entire document

11:03 5    preparing your report?

6         A    Yes.

7         Q    Did you review any documents that were used

8    to prepare this document that's been marked as

9    Exhibit 5?

11:03 10        A    No.  I requested the backup behind it, but

11   it was never received.

12        Q    Did you talk to any of the authors of this

13   report?

14        A    No.

11:03 15        Q    Do you know who wrote this report?

16        A    ipCapital Group.

17        Q    Do you know which individuals wrote this

18   report at ipCapital Group?

19        A    No.

11:03 20        Q    Did you review any other documents prepared

21   by ipCapital Group?

22        A    No.

23        Q    We'll discuss this document a little more

24   when we get into the substance of your opinions.

11:04 25             I just want to be clear, this is the only

```
 1    document created by ipCapital Group that you

 2    reviewed, correct?

 3         A    Correct.

 4         Q    The next item listed on page 6 of 7 of your

11:04 5    report is a "Letter from Great American Life

 6    Insurance Company dated October 31, 2011."

 7              (Defendants' Exhibit 6 was marked

 8         for identification and is attached

 9         hereto.)

11:04 10  BY MR. STEWART:

 11        Q    I've handed you what's been marked as

 12   Exhibit 6.

 13             Is this the letter referred to in your

 14   report?

11:04 15        A    Yes.

 16             (Defendants' Exhibit 7 was marked

 17        for identification and is attached

 18        hereto.)

 19   BY MR. STEWART:

11:04 20        Q    Number 5 under your list of "Items

 21   Considered" on page 6 of your report is an

 22   "Assignment and Transfer Statement as to

 23   Intellectual Property dated August 2, 2011."

 24             Is the document I handed you as Exhibit 7

 25   that document?
```

1       Q    Who would have sent you those calculations?

2       A    Again, the attorneys.

3       Q    And sitting here today, you think you might

4  have received them, but you just don't recall for

11:15  5  sure?

6       A    I don't recall, but I didn't use that data

7  in my analysis.  I just used that the judgment was

8  entered.

9       Q    If that data was sent to you, it would be in

11:15 10  the documents that you brought today?

11       A    Yes.

12       Q    Number 7 under your list of "Items

13  Considered" on page 6 of 7 of your report refers to a

14  deposition of Donald Yu; is that correct?

11:15 15       A    Yes.

16       Q    And am I correct that you did not review

17  that entire deposition?  Is that correct?

18       A    Correct.

19       MR. STEWART:  Can we please mark that as

11:16 20  Exhibit 9?

21       THE REPORTER:  Yes.

22            (Defendants' Exhibit 9 was marked

23            for identification and is attached

24            hereto.)

11:16 25  BY MR. STEWART:

 1      Q    Ms. Ford, I've handed you what's been marked

 2   as Exhibit 9.

 3           Is this the portion of the deposition

 4   transcript of Mr. Yu's deposition that you reviewed

11:16  5   in preparation for your work on this case?

 6      A    Yes.

 7      Q    And just to be clear, this was a deposition

 8   of Mr. Yu in another case, not this case; is that

 9   correct?

11:16 10      A    That's my understanding.

11      Q    And it's a case that involved a company

12   called Belkin International, correct?

13      A    Yes.

14      Q    I'll represent to you that Mr. Yu was also

11:16 15   deposed in this case.

16           Did you review the transcript of that

17   deposition?

18      A    No.

19      Q    I'll represent to you that Arthur Cohen

11:16 20   testified as a corporate representative of the

21   plaintiff in a deposition in this case.

22           Did you review the transcript of that

23   deposition?

24      A    No.

11:16 25      Q    I'll represent to you that Reba Gong was

1    deposed in this case.

2             Did you review a transcript of that

3    deposition?

4        A    No, although --

11:17 5          Let me back up.  I recall reading a

6    transcript of a depo in this case that talked about

7    her deposition.  Maybe it came after my report.

8             Do you know the dates of those depositions?

9        Q    I do.

11:17 10       A    Were they after mine or before mine?

11       Q    They would have been before your report,

12    although I'm not testifying.

13       A    I don't recall.  I don't recall.

14       Q    So focusing on the period of time, you're

11:17 15  drawing the distinction, understandably, between the

16    period of time before and after you prepared your

17    report.

18             After you prepared your report, did you

19    review Mr. Yu's deposition in this case?

11:17 20       A    I don't believe so.

21       Q    Did you review Mr. Cohen's deposition in

22    this case?

23       A    I don't believe so.

24       Q    Did you review Ms. Gong's deposition in this

11:17 25  case?

1    reviewed?

2        A    Yes.

3        Q    Thank you.

4            And I know I've belabored this point, but

11:22  5    these are the only documents referred to in your

6    report, correct, that we've looked at today?

7        A    Yes.

8        Q    I think you've testified that you also

9    looked at some document requests, a communication

11:23 10    from Ms. Gong.

11            Was there anything else that you reviewed in

12    preparing your report that we haven't talked about

13    today?

14        A    Not that I recall.

11:23 15        Q    This case, I wasn't sure you know, involves

16    in part an intellectual property portfolio, correct?

17        A    Yes.

18        Q    And that portfolio includes patents,

19    correct?

11:23 20        A    Yes.

21        Q    That's your understanding?

22        A    Yes.

23        Q    Did you read or review any of the patents

24    themselves before preparing your report?

11:23 25        A    I reviewed the listing that's included in

```
 1   the asset purchase agreement, but I didn't actually
 2   review the patents themselves, the drawings.
 3       Q   And just so the record's clear, by "asset
 4   purchase agreement," you mean the April 10, 2009
11:23 5   asset purchase agreement?
 6       A   Correct.
 7       Q   Have you reviewed any of the patents
 8   themselves at issue in this case since you prepared
 9   your report?
11:23 10      A   No.
11       Q   We've talked about the documents you
12   reviewed, what you did to prepare your report.
13   I'd like to move on to what I consider the meat and
14   potatoes of the deposition which is the actual
11:24 15  opinions expressed in your report.
16           So for now, let's turn back to Exhibit 1
17   which is the report itself.
18           As we've discussed, your analysis was
19   focused solely on the April 10, 2009 transaction,
11:24 20  correct?
21       A   Correct.
22       Q   And any analysis or work that you did in
23   this report is concerning the amount of assets as of
24   that date, correct?
11:24 25      A   Correct.
```

1    Q    And is it your understanding that the effect

2    of the April 10, 2009 asset purchase agreement was to

3    transfer all or substantially all of the plaintiff's

4    assets to Aerielle, LLC?

11:25  5    A    I'm not -- yes.

6    Q    And is it your understanding that in

7    exchange, Aerielle, LLC assumed all of plaintiff's

8    liabilities?

9    A    No, they did not.

11:25 10    Q    What do you mean by that?

11    A    They assumed very specific liabilities, and

12    it's listed in the asset purchase agreement.  They

13    assumed the 8 million in debt and I believe some of

14    the accounts payable, but the asset purchase

11:25 15    agreement says they're purchasing all the assets that

16    Aerielle could have and then these specific

17    liabilities.

18    Q    Are you aware of any specific liabilities

19    that were not assumed by Aerielle, LLC?

11:25 20    A    That's a very good question.

21    Q    I usually get one.

22    A    I didn't list what would not be assumed.

23    I didn't consider that.  I just made -- I created a

24    document that says these are the liabilities assumed.

11:25 25    I didn't really examine what was not included.

1      A    For Aerielle to purchase them, they had to

2   be listed because the asset purchase agreement says

3   we purchased all assets.  And only these liabilities

4   were specifically listed, so if it wasn't listed,

11:39  5   they wouldn't be assuming them.

6      Q    So to you --

7      A    And I believe they -- listed on the assets

8   they purchased would be the agreements with these

9   manufacturers.

11:39 10      Q    So just so I'm understanding, there were

11   certain agreements with manufacturers that were part

12   of the transfer of assets in this case?

13      A    Yes.  There was a lot of intellectual

14   property that was transferred, excluding the patents,

11:39 15   besides the patents.

16      Q    And there were certain liabilities under

17   those agreements that appeared as liabilities in the

18   asset purchase agreement, and that's what we're

19   talking about now?

11:39 20      A    They were listed as liabilities.

21      Q    Did you ask Mr. Cohen why he signed a

22   document that listed these as liabilities?

23      A    No.

24      Q    Are you familiar with GAAP, G-A-A-P?

11:40 25      A    Yes.

1          Q    What is it?

2          A    Generally Accepted Accounting Principles.

3          Q    What are they?

4          A    Rules and regulations accountants follow to

11:40  5    provide financial statements in accordance with GAAP.

6          Q    Are those the standards that govern your

7    profession?

8          A    I don't produce financial statements.  It

9    doesn't rule forensic accounting.  It's over

11:40 10   financial statements.

11         Q    Were Aerielle, LLC's balance sheets prepared

12   in accordance with GAAP?

13         A    I don't know specifically.  I would assume

14   so because that's how you're supposed to produce

11:40 15   them.

16         Q    Do you know if the financial statements for

17   Aerielle, LLC and Aerielle, Inc. were audited?

18         A    If they were audited, they're according to

19   GAAP.  I don't know if they were audited, reviewed,

11:40 20   or compiled.

21         Q    So you don't know what standards were used

22   to create the balance sheets of Aerielle, LLC and

23   Aerielle, Inc., correct?

24         A    Correct.

11:41 25        Q    You don't know what standards were used to

1    create the balance sheets that you used in creating

2    your report, correct?

3        A    Correct.

4        Q    Do you know what assumptions were made to

11:41 5    create the balance sheets that you relied on in

6    preparing your report?

7        A    I do not know what assumptions were made.

8        Q    Did you do any independent review of the

9    documents and materials available as of April 30,

11:41 10    2009 to determine if the balance sheets complied with

11    GAAP?

12        A    I did not.

13        Q    Did you do any review of the balance sheets

14    of Aerielle, Inc. and Aerielle, LLC to determine if

11:41 15    they complied with some other standard other than

16    GAAP?

17        A    I did not.

18        Q    Are you aware sitting here today of any

19    other standards that could have applied?

11:42 20        A    No.

21        Q    And I know I started off by saying we were

22    going to talk about the liabilities listed in your

23    report.

24            Would that discussion of GAAP also apply to

11:42 25    the listing of assets on the balance sheets of

1    Aerielle, Inc. and Aerielle, LLC?

2        A    Either their balance sheets are conforming

3    with GAAP or they're not.

4        Q    And sitting here today, you don't know

11:42 5    whether they comply with GAAP, correct?

6        A    Correct.

7        Q    Okay.  Can you turn to page 3 of your

8    report?  And I'd like to talk just now about the

9    assets, your analysis of the amount of assets that

11:43 10    were transferred pursuant to the April 10, 2009 asset

11    purchase agreement.  And we've talked about this

12    before.

13        On the bottom of page 3 of your report and

14    flowing over to page 4, you mentioned that you used

11:43 15    Aerielle's April 30, 2009 balance sheet to determine

16    some of the assets that were transferred on April 10,

17    2009, correct?

18        A    Correct.

19        Q    And just so I'm sure that I understand, that

11:43 20    was because you couldn't find any balance sheets as

21    of April 10, 2009, correct?

22        A    Correct.

23        Q    So you used the April 30, 2009 balance

24    sheets as a reasonable approximation of the April 10,

11:44 25    2009 assets that were transferred?

1      Q   Ms. Ford, I've handed you what's been marked

2   as Exhibit 11.  I believe before we went off the

3   record, you referenced a workpaper where you listed

4   the lawsuits that you incorporated into your report

12:04  5   as an asset number.

6           Is this the workpaper that you were

7   referring to?

8      A   Yes.

9      Q   So to be clear, this is a list of lawsuits

12:04 10   and specifically settlements that you deemed could be

11   collected in the future by -- or would likely be

12   collected in the future by Aerielle, LLC; is that

13   fair?

14      A   It is the listing of the litigation claims

12:04 15   that's in the asset purchase agreement for items that

16   I thought at the time were deemed collectable and had

17   a reasonable value.

18      Q   It was, again, your understanding and

19   assumption that none of these settlement agreements

12:04 20   had actually been collected on?

21      A   Correct.

22      Q   I'd like to look at the first lawsuit listed

23   here.

24      A   Yep.

12:04 25   ████████████████████████████████████████████████

```
 1  ████████████████████████████████████████████

 2  ████████████████████████████████████████████

 3  ████████████████████████████████████████████

 4       A    Yes.

 5       Q    So you were assuming that a settlement

 6  agreement that was signed on August 10, 2007 hadn't

 7  been paid as of April 10, 2009?

 8       A    Yes.

 9       Q    What was the basis of that understanding?

10       A    That was my understanding.

11       Q    What was the basis of that understanding?

12       A    I was told none of it had been collected.

13       Q    Who told you that?

14       A    Counsel.

15       Q    Did you do any other analysis to determine

16  whether that Monster settlement had been collected?

17       A    When you read the description in the asset

18  purchase agreement --

19       Q    And again, you're looking on Schedule 3.11

20  of the April 10, 2009 asset purchase agreement that's

21  been marked as Exhibit 3 in this deposition?

22       A    Yes.

23       Q    Go ahead.

24  ████████████████████████████████████████████

25  ████████████████████████████████████████████
```



1
2
3
4
12:06  5
6
7
8
9
12:06 10
11
12
13
14
12:06 15
16
17
18          (Whereupon the following portion
19       of the transcript was deemed highly
20       confidential and bound separately.)
21
22
23
24
25

1    assets that were transferred on April 10, 2009,

2    correct?

3        A    Yes.

4        Q    But you're using a report that's dated

12:17  5    December 23, 2009?

6        A    Yes.  It was the only information I had.

7        Q    And you're not --

8        A    It was the best information I had.

9        Q    You're not opining on the value of any of

12:17 10    the intellectual property as of December 23, 2009,

11    correct?

12        A    Correct.

13        Q    That was the only information that you used

14    to estimate the amount of assets that were

12:17 15    transferred on April 10, 2009, correct?

16        A    Yes.

17        Q    In the course of your work on this case, did

18    you analyze the difference in the economy between

19    April 2009 and December 2009?

12:18 20        A    No.

21        Q    Did you analyze the equity markets in

22    April 2009 and December 2009?

23        A    No.

24        Q    Is it your opinion that the value of the

12:18 25    IP assets was unchanged from April 10, 2009 to

1    December 23, 2009?

2        A    My opinion is this was a reasonable estimate

3    based on the information available.

4        Q    Is it your opinion that the value of the

12:18 5    assets did not change from April 10, 2009 to

6    December 23, 2009?

7        A    I have seen nothing that leads me to believe

8    they have changed.

9        Q    Did you analyze the relative strengths of

12:18 10    Aerielle, Inc. in April 2009 versus Aerielle, LLC in

11    December 2009?

12        A    The value of the patents is not the same

13    thing as the value of the company, so I did not look

14    at the value of the company.

12:18 15        Q    Is it your opinion sitting here today that

16    the value of the patents has no connection at all to

17    the value of the company?

18        A    Yeah.

19            Again, I'm not an expert in valuing patents.

12:19 20        Q    You're not an expert in valuing patents?

21        A    No.

22        Q    Did you consider any changes in the MP3

23    market in 2009?

24        A    No.

12:19 25        Q    Did you analyze sales trends between

1    April 2009 and December 2009?

2         A    No.

3         Q    Did you consider whether Aerielle, Inc. was

4    in default of any of its obligations to

12:19 5    Great American Life Insurance Company in April 2009?

6         A    No.

7         Q    Did you consider whether Aerielle, Inc. was

8    in danger of being in default of its obligations to

9    Great American Life Insurance Company in April 2009?

12:19 10        A    No.

11        Q    Did you consider whether in December 2009

12   the owner of the patents had access to more capital

13   than the owner of the patents did in April 2009?

14        A    No.

12:19 15        Q    Did you do any research concerning iPod

16   sales trends at all in connection with this report?

17        A    No.

18        Q    And again, Exhibit 5 is the ipCapital

19   presentation that you reviewed, correct?

12:20 20        A    Correct.

21        Q    In addition to the asset purchase agreement?

22        A    Correct.

23        Q    And I think we covered this, but you had no

24   discussions with the person or persons who prepared

12:20 25   this report, correct?

1    A    Correct.

2    Q    And you don't even know sitting here today

3  who it was that wrote this report?

4    A    Correct.

12:20 5    Q    Do you have any opinion as to the

6  qualifications of the people who wrote this report?

7    A    No.

8    Q    Do you know what assumptions and

9  methodologies were used to create this report?

12:20 10    A    Only what is listed in that report.

11    Q    Did you make any effort to recreate

12  ipCapital's work?

13    A    No.

14    Q    Did you review any of the backup data that

12:20 15  ipCapital used to create this report?

16    A    No.  I requested the information behind it,

17  but it wasn't received.

18    Q    And you asked for that from counsel for

19  plaintiff?

12:20 20    A    Yes.

21    Q    Did you do any analysis to determine the

22  reasonableness of this report?

23    A    I read it.  I reviewed their assumptions.

24  It appears reasonable, and it seemed that that was

12:21 25  the information that the parties to the asset

1    purchase agreement believed and supported at the

2    time, being April 10, 2009.

3         Q    You believe that the parties -- strike that.

4              Is it your understanding that all of the

12:21 5    parties to the asset purchase agreement in April 10,

6    2009 assigned a value to the patents that's

7    consistent with ipCapital's financial model prepared

8    on December 23, 2009?

9         A    I can't -- I don't know what all of the

12:21 10   parties were thinking at that particular moment, but

11   based on the information provided and the progress of

12   data, meaning that GALIC invested more money, that

13   Aerielle hired ipCapital to create that valuation,

14   that Aerielle relied on that valuation in future

12:22 15   things, it seemed like it was relied on by the

16   companies.

17        Q    They could not have relied on this report on

18   April 10, 2009, correct?

19        A    Correct.

12:22 20        Q    Did you review any litigation cases for

21   ipCapital as offered testimony concerning the value

22   of intellectual property?

23        A    No.

24        Q    Did you review any testimony in any

12:22 25   proceeding from any current or former ipCapital

1          Q    You actually assigned an amount higher than

2     10.2 million to the intellectual property, correct?

3          A    Yes.  I used the $12 million figure because

4     this valuation was just for patents.  The asset

12:26  5     purchase agreement lists a plethora of intellectual

6     property that was included.  So I felt that would be

7     a reasonable estimate of all the intellectual

8     property.

9          Q    Is there any reference in this report to

12:26 10     trademarks?

11          A    In the ipCapital's report?  No.  It's just

12     for patents.

13          Q    So you were using a report that doesn't

14     reference trademarks to value a patent portfolio that

12:27 15     includes trademarks?

16          A    Right, and for a few other points listed in

17     my report.

18          Q    Understood.

19          A    That was one of the factors, yes.

12:27 20          Q    We'll go back to your decision to select the

21     aggressive rather than the conservative, reasonable

22     assumption.

23               Focusing on page 4, the last bullet point

24     there says, "All assumptions should be confirmed."

12:27 25               Did I read that correctly?

1       A    Yes.

2       Q    What assumptions is that referring to?

3       A    I would assume the "Assumptions and Notes"

4    and any of the assumptions that go into the financial

12:27 5    model.  Unfortunately, I don't have the details

6    behind it to tell you what assumptions went into

7    these models.

8       Q    So you made no effort to confirm the

9    assumptions?

12:27 10      A    I made the effort.  The information was not

11    provided.

12       Q    In the end, you were unable to confirm the

13    assumptions?

14       A    Correct.

12:28 15      Q    Can you turn to page 12 of this

16    presentation?  This page of the presentation refers

17    to "Assumptions, IP Monetization Values."

18            Did I read that correctly?

19       A    Yes.

12:28 20      Q    If you look at the last bullet point here,

21    there's a reference to the 25 percent rule.

22       A    Yes.

23       Q    Do you know what the 25 percent rule is?

24       A    Yes.

12:28 25      Q    What is it?

1      A    It's a rule of thumb stating that when

2    you're valuing a patent, certain percentage would be

3    a normal royalty rate based on the net income of

4    that.

12:28  5         Does that explain it?  I'm sure you already

6    know what it means.

7      Q    Did you have an understanding of what the

8    25 percent rule was when you prepared your report?

9      A    Yes.

12:28 10    Q    Had you used the 25 percent rule in any

11    other matters?

12      A    No.

13      Q    How did you learn about the -- strike that.

14         Did you do research concerning the

12:28 15    25 percent rule?

16      A    No.  For this case, I did not.

17      Q    How did you know what the 25 percent rule

18    was?

19      A    Previous cases.

12:29 20    Q    So you had worked on previous cases

21    involving the 25 percent rule?

22      A    It applies to royalties to patents, so I've

23    done some analysis on royalties.  That's one of the

24    ways that they ballpark a normal royalty figure.

12:29 25    Q    Do you know whether courts apply the

1      assets that were transferred on April 10, 2009,

2      correct?

3           A    Yes.

4           Q    But you're using a report that's dated

12:17 5    December 23, 2009?

6           A    Yes.  It was the only information I had.

7           Q    And you're not --

8           A    It was the best information I had.

9           Q    You're not opining on the value of any of

12:17 10   the intellectual property as of December 23, 2009,

11     correct?

12          A    Correct.

13          Q    That was the only information that you used

14     to estimate the amount of assets that were

12:17 15   transferred on April 10, 2009, correct?

16          A    Yes.

17          Q    In the course of your work on this case, did

18     you analyze the difference in the economy between

19     April 2009 and December 2009?

12:18 20         A    No.

21          Q    Did you analyze the equity markets in

22     April 2009 and December 2009?

23          A    No.

24          Q    Is it your opinion that the value of the

12:18 25   IP assets was unchanged from April 10, 2009 to

1    December 23, 2009?

2          A    My opinion is this was a reasonable estimate

3    based on the information available.

4          Q    Is it your opinion that the value of the

12:18  5    assets did not change from April 10, 2009 to

6    December 23, 2009?

7          A    I have seen nothing that leads me to believe

8    they have changed.

9          Q    Did you analyze the relative strengths of

12:18 10   Aerielle, Inc. in April 2009 versus Aerielle, LLC in

11   December 2009?

12         A    The value of the patents is not the same

13   thing as the value of the company, so I did not look

14   at the value of the company.

12:18 15         Q    Is it your opinion sitting here today that

16   the value of the patents has no connection at all to

17   the value of the company?

18         A    Yeah.

19              Again, I'm not an expert in valuing patents.

12:19 20         Q    You're not an expert in valuing patents?

21         A    No.

22         Q    Did you consider any changes in the MP3

23   market in 2009?

24         A    No.

12:19 25         Q    Did you analyze sales trends between

110

1  April 2009 and December 2009?

2      A   No.

3      Q   Did you consider whether Aerielle, Inc. was

4  in default of any of its obligations to

12:19 5  Great American Life Insurance Company in April 2009?

6      A   No.

7      Q   Did you consider whether Aerielle, Inc. was

8  in danger of being in default of its obligations to

9  Great American Life Insurance Company in April 2009?

12:19 10     A   No.

11     Q   Did you consider whether in December 2009

12  the owner of the patents had access to more capital

13  than the owner of the patents did in April 2009?

14     A   No.

12:19 15     Q   Did you do any research concerning iPod

16  sales trends at all in connection with this report?

17     A   No.

18     Q   And again, Exhibit 5 is the ipCapital

19  presentation that you reviewed, correct?

12:20 20     A   Correct.

21     Q   In addition to the asset purchase agreement?

22     A   Correct.

23     Q   And I think we covered this, but you had no

24  discussions with the person or persons who prepared

12:20 25  this report, correct?

1          A    Correct.

2          Q    And you don't even know sitting here today

3    who it was that wrote this report?

4          A    Correct.

12:20  5    Q    Do you have any opinion as to the

6    qualifications of the people who wrote this report?

7          A    No.

8          Q    Do you know what assumptions and

9    methodologies were used to create this report?

12:20 10   A    Only what is listed in that report.

11         Q    Did you make any effort to recreate

12   ipCapital's work?

13         A    No.

14         Q    Did you review any of the backup data that

12:20 15  ipCapital used to create this report?

16         A    No.  I requested the information behind it,

17   but it wasn't received.

18         Q    And you asked for that from counsel for

19   plaintiff?

12:20 20   A    Yes.

21         Q    Did you do any analysis to determine the

22   reasonableness of this report?

23         A    I read it.  I reviewed their assumptions.

24   It appears reasonable, and it seemed that that was

12:21 25  the information that the parties to the asset

1    purchase agreement believed and supported at the

2    time, being April 10, 2009.

3        Q    You believe that the parties -- strike that.

4            Is it your understanding that all of the

12:21 5    parties to the asset purchase agreement in April 10,

6    2009 assigned a value to the patents that's

7    consistent with ipCapital's financial model prepared

8    on December 23, 2009?

9        A    I can't -- I don't know what all of the

12:21 10    parties were thinking at that particular moment, but

11    based on the information provided and the progress of

12    data, meaning that GALIC invested more money, that

13    Aerielle hired ipCapital to create that valuation,

14    that Aerielle relied on that valuation in future

12:22 15    things, it seemed like it was relied on by the

16    companies.

17        Q    They could not have relied on this report on

18    April 10, 2009, correct?

19        A    Correct.

12:22 20        Q    Did you review any litigation cases for

21    ipCapital as offered testimony concerning the value

22    of intellectual property?

23        A    No.

24        Q    Did you review any testimony in any

12:22 25    proceeding from any current or former ipCapital

1          Q    You actually assigned an amount higher than

2     10.2 million to the intellectual property, correct?

3          A    Yes.   I used the $12 million figure because

4     this valuation was just for patents.   The asset

12:26 5     purchase agreement lists a plethora of intellectual

6     property that was included.   So I felt that would be

7     a reasonable estimate of all the intellectual

8     property.

9          Q    Is there any reference in this report to

12:26 10    trademarks?

11         A    In the ipCapital's report?   No.   It's just

12    for patents.

13         Q    So you were using a report that doesn't

14    reference trademarks to value a patent portfolio that

12:27 15    includes trademarks?

16         A    Right, and for a few other points listed in

17    my report.

18         Q    Understood.

19         A    That was one of the factors, yes.

12:27 20        Q    We'll go back to your decision to select the

21    aggressive rather than the conservative, reasonable

22    assumption.

23              Focusing on page 4, the last bullet point

24    there says, "All assumptions should be confirmed."

12:27 25              Did I read that correctly?

```
 1          A    Yes.

 2          Q    What assumptions is that referring to?

 3          A    I would assume the "Assumptions and Notes"

 4     and any of the assumptions that go into the financial

12:27 5 model.  Unfortunately, I don't have the details

 6     behind it to tell you what assumptions went into

 7     these models.

 8          Q    So you made no effort to confirm the

 9     assumptions?

12:27 10         A    I made the effort.  The information was not

11     provided.

12          Q    In the end, you were unable to confirm the

13     assumptions?

14          A    Correct.

12:28 15         Q    Can you turn to page 12 of this

16     presentation?  This page of the presentation refers

17     to "Assumptions, IP Monetization Values."

18               Did I read that correctly?

19          A    Yes.

12:28 20         Q    If you look at the last bullet point here,

21     there's a reference to the 25 percent rule.

22          A    Yes.

23          Q    Do you know what the 25 percent rule is?

24          A    Yes.

12:28 25         Q    What is it?
```


1          THE WITNESS:  I was thinking if you're trying to

2    narrow this down to the only thing that changed, that

3    nothing changed besides they did a valuation, they

4    might try to do something creative, but no.

12:43  5    BY MR. STEWART:

6          Q    Okay.  In the end, you assigned a value to

7    the IP of $12,371,017, correct?

8          A    Yes.

9          Q    And you assigned a value to all of the

12:43 10    assets that were transferred on April 10, 2009 of

11    $16,748,854, correct?

12          A    Right.

13          Q    So the number you came up with, the purchase

14    assets less assumed liabilities, is 7,614,971,

12:44 15    correct?

16          A    Yes.

17          Q    Shouldn't that be the assets minus the

18    liabilities?

19          A    Are you telling me I did my math wrong?

12:44 20          Q    I think so.  I want to make sure I'm not

21    missing something.

22              Well, do you want to use this calculator to

23    confirm it?

24              I don't think it's a huge difference, but

12:45 25    when I do it, I'm missing about $50.  I just want to

1      make sure I'm not missing something, I'm looking at

2      the right numbers.

3          A    That would surprise me if there was a math

4      error.

12:45  5          Nope.  I get the same number, 16 minus the 9

6      on Exhibit 1.  Maybe I typed it wrong in the report.

7      It's possible that I input it into the report wrong.

8          Oh, I did.  Look, Exhibit 1 is 883.  The

9      right number is 883.

12:45 10          Q    So this is a typo in the report, you just

11     put a 3 where there should be an 8?

12         A    Yes.

13         Q    Thank you.

14         A    But the Exhibit 1 is correct.

12:45 15     MR. STEWART:  That probably wasn't clear for the

16     record.  I was trying to do her math and -- well,

17     strike that.

18         Q    Just so your testimony is clear, the correct

19     numbers are what is contained in Exhibits 1 and 2,

12:46 20     correct?

21         A    Yes.

22         Q    Thank you.

23          Let's mark this as Exhibit 13.

24          (Defendants' Exhibit 13 was marked

12:46 25      for identification and is attached

1        hereto.)

2   BY MR. STEWART:

3        Q   Ms. Ford, I've handed you what's been marked

4   as Exhibit 13.

12:46 5        Is this the invoice that you prepared that

6   reflects the work you did in this case, at least

7   through October 16, 2015?

8        A   Yes.

9        Q   Does this actually reflect the compensation

12:47 10   that you received or expect to receive?

11       A   Yes.

12       Q   And does this reflect all the time that you

13   worked on this report prior to October 16, 2015?

14       A   Yes.

12:47 15       Q   And I know we talked briefly about some work

16   you had done since October 16, 2015 to prepare for

17   this deposition.

18       Have you created an invoice that reflects

19   that work yet?

12:47 20       A   No.

21       MR. STEWART:  Let's go off the record.

22       (Off the record.)

23       MR. STEWART:  I have no more questions.  Thank

24   you very much for your time.  That's all I have.

25   /

# EXHIBIT C





# EXHIBIT D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| AJZN, INC. f/k/a AERIELLE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-149-GMS |
| | ) | |
| DONALD YU, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## <u>VERIFICATION</u>

| | |
|---|---|
| STATE OF OHIO | ) |
| | ) SS |
| HAMILTON COUNTY | ) |

**Joseph Stelzer**, being first duly sworn on oath, deposes and states that he is the authorized representative of the following defendants in the above-entitled action; that he has read and reviewed the following answers to discovery requests propounded by plaintiff and knows the contents thereof:

(1) Defendant **Aerielle, LLC**'s Answer to Plaintiff AJZN Inc. F/K/A Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things (dated June 7, 2015); and

(2) Defendant **Aerielle IP Holdings, LLC**'s Answer to Plaintiff AJZN Inc. F/K/A Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things (dated July 7, 2015);

With respect to the interrogatory portion of each of the above responses, the answers were prepared with the assistance and advice of counsel and the assistance of employees and representatives of each entity; the answers set forth in the responses, subject to inadvertent or undiscovered errors, are based on, and therefore necessarily limited by, the records and

information still in existence, presently recollected and thus far discovered in the course of the preparation of these answers (and consequently, the defendants reserve the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more accurate information is available). Subject to the limitations set forth herein, said answers are true to the best of Mr. Stelzer's knowledge, information and belief.

_____

Joseph Stelzer
Authorized Representative of Aerielle, LLC
and Aerielle IP Holdings, LLC

Subscribed and sworn to before me this

20th day of August , 2015

_____
Notary Public, State of Ohio

My Commission 9/26/2020

6284096.2

Karen L. Frommeyer
Notary Public, State of Ohio
My Commission Expires 09-26-2020

# EXHIBIT E

| | |
|---|---|
| AJZN, INC. f/k/a AERIELLE, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 13-149-GMS |
| | ) |
| DONALD YU, et al. | ) |
| | ) |
| | ) |
| Defendants. | ) |

## VERIFICATION

| | |
|---|---|
| STATE OF | ) |
| | ) SS |
| COUNTY OF | ) |

**Donald Yu**, being first duly sworn on oath, deposes and states that he is the authorized representative of **Aerielle Acquisitions Corporation** and **Aerielle Technologies, Inc.**; that he has read and reviewed Aerielle Acquisition Corporation's Answer to Plaintiff AJZN Inc. F/K/A Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things (dated August 1, 2015) and Aerielle Technolgies, Inc.'s Answer to Plaintiff AJZN Inc. F/K/A Aerielle, Inc.'s First Set of Interrogatories and Second Set of Requests for Production of Documents and Things (dated July 7, 2015). With respect to the interrogatory portion of those responses (and dating from his employment in or about 2008), the answers were prepared with the assistance and advice of counsel and the assistance of employees and representatives; the answers set forth in the responses, subject to inadvertent or undiscovered errors, are based on, and therefore necessarily limited by, the records and information still in existence, presently recollected and thus far discovered in the course of the preparation of these answers (and consequently, the defendants reserve the right to make any changes in the responses if it appears at any time that omissions or errors have been made therein or that more

accurate information is available).  Subject to the limitations set forth herein, said answers are

true to the best of Mr. Yu's knowledge, information and belief.

_____  09-08-15

Donald Yu
Authorized    Representative    of    Aerielle
Acquisitions    Corporation    and    Aerielle
Technologies, Inc.

Subscribed and sworn to before me this

_____ day of _____, 2015

_____

Notary Public, State of _____

My Commission _____

6286327

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California
County of _Santa Clara_

Subscribed and sworn to (or affirmed) before me
on this _8th_ day of _Sept_, 20_15_.
            Date        Month        Year
by
(1) _Donald Yu_

(and (2) _____).
            Name(s) of Signer(s)

proved to me on the basis of satisfactory evidence
to be the person(s) who appeared before me.

Signature _____
            Signature of Notary Public

SHUBHRA GARG
Commission # 2051366
Notary Public - California
Santa Clara County
My Comm. Expires Jan 7, 2018

## <u>CERTIFICATE OF SERVICE</u>

I, Aimee M. Czachorowski, hereby certify that on this 11th day of February, 2016, I caused

a true and correct copy of the foregoing **Second Declaration of Benjamin G. Stewart** to be served

on the below counsel of record via email and U.S. First-Class Mail as follows:

Blake A. Bennett, Esquire
Cooch and Taylor, P.A.
The Brandywine Building
1000 West Street, 10th Floor
Wilmington, DE  19899
bbennett@coochtaylor.com

Lawrence J. Hilton, Esquire
Kathleen A. Donahue, Esquire
O'Neil LLP
19900 MacArthur Blvd
Suite 1050
Irvine, CA  92612
lhilton@oneil-llp.com
kdonahue@oneil-llp.com


                         */s/ Aimee M. Czachorowski*
                         Aimee M. Czachorowski (Bar No. 4670)